UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

KEITH O. BEAL,                          )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )   Case No. 1:10CV65 FRB
                                        )
MICHAEL J. ASTRUE, Commissioner         )
of Social Security,                     )
                                        )
          Defendant.                    )

**MEMORANDUM AND ORDER**

This cause is before the Court on plaintiff Keith O. Beal's appeal of an adverse ruling of the Social Security Administration.  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On January 5, 2007, plaintiff Keith O. Beal ("Plaintiff") filed applications for Disability Insurance Benefits (also "DIB") pursuant to Title II, and for Supplemental Security Income (also "SSI") pursuant to Title XVI, of the Social Security Act, 42 U.S.C. §§ 401, et seq. (also "Act"), alleging disability beginning October 1, 2006 due to heart problems, depression, and anxiety. (Administrative Transcript ("Tr.") 126-36).  Plaintiff's applications were initially denied, and he requested a hearing before an Administrative Law Judge (also "ALJ"), which was held on February 9, 2009. (Tr. 12-38).  On March 23, 2009, the ALJ issued

-1-

his decision denying plaintiff's claims.  (Tr. 9-21).

Plaintiff sought review from defendant agency's Appeals Council which, on March 24, 2010, denied his request for review. (Tr. 3-6).  On May 10, 2010, the Appeals Council noted that it had received more evidence, consisting of records from Southeast Missouri Hospital dating from January 5, 2010 to March 2, 2010. (Tr. 1).  On that date, the Appeals Council wrote that the additional evidence was about a time later than that covered by the ALJ's decision, and refused to review its denial of plaintiff's request for reopening.  (Id.)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  <u>Plaintiff's Testimony</u>

During Plaintiff's administrative hearing, he responded to questions from the ALJ and from his attorney.  When questioned by the ALJ, Plaintiff testified that he was 34 years of age, and lived in a one-story house with his wife and six-year-old child. (Tr. 29-30).  He has never served in the military.  (Tr. 31).  He has a high school diploma, and can read and write.  (Tr. 32-33). He receives Medicaid, and his only source of income is from his wife's assembly worker job at Schaefer's Power Panels.  (Tr. 31).

Plaintiff testified that his wife had driven him to the administrative hearing.  (Tr. 30).  Plaintiff stated that he was able to drive and had a valid driver's license, and had in fact driven his daughter to school that morning, but that he could drive only short distances, for a total of about one or two miles per

week.  (Tr. 30-31).

Plaintiff testified that he suffered an on-the-job injury in 1994, shortly after graduating from high school. (Tr. 32).  He explained that he was lifting a heavy spool of wire onto a rack and sprained his back. (Id.)  He filed for Workers' Compensation, but did not receive a settlement. (Id.)  In 1996, Plaintiff collected unemployment benefits.  (Tr. 32).

The ALJ noted that Plaintiff had alleged in his application that he had last worked on September 2, 2006, and that the record showed that he had earned income in 2006.  (Tr. 33).  Plaintiff, however, did not recall working until after having open heart surgery (which the record documents was performed in January of 2007).  (Id.)  Plaintiff testified that the last work he performed was building sheds for a company called Tri-County Metal, and that he worked for less than one week.  (Tr. 34).  Plaintiff testified that he tried to return to work after having open heart surgery but was unable to perform the job duties because he would get hot, which caused him to get sick. (Id.)  Plaintiff testified that his employer unsuccessfully tried to find a job he could perform. (Id.)  Plaintiff testified that he was not currently working and had not applied for work.  (Tr. 34-35).

Plaintiff testified that he worked as an assistant manager at Horizon Music from 1995 to 1997, and was responsible for opening and closing, supervising employees, and helping customers, but did not hire and fire, keep time records, or manage payroll. (Tr. 36-37).  Plaintiff left this job to make more money laying

-3-

asphalt, and also worked as a painter in 1999, 2000 and 2004. (Tr. 39). Plaintiff also worked for one year for Holloway Distributing, delivering items like cigarettes, soda, and candy bars to stores. (Tr. 38). Plaintiff testified that this job involved lifting over 100 pounds, and loading and unloading dollies. (Id.) He stated that he was fired because he could no longer perform his duties. (Id.) In 1997-1998 and 2003-2004, Plaintiff worked as a salesman, selling body shop supplies. (Tr. 40). He stated that he was fired because he could not remember his routes or items that customers needed. (Tr. 41). In 2006, Plaintiff worked as an exterminator for six months, and was fired for being forgetful. (Tr. 41-42).

Plaintiff testified that he chose October 1, 2006 as his onset date because that was the date of his heart attack. (Tr. 35). He stated that he was hospitalized for a week following his heart attack. (Id.)

Plaintiff testified that he rose around five o'clock in the morning, and tried to do housework such as dishes, and would have to rest intermittently. (Tr. 43). He stated that he took his daughter to school, but did not help her get ready or make her breakfast. (Id.) Plaintiff testified that he liked to cook but did not because doing so made him hot and sick and caused chest pain. (Tr. 43-44). Plaintiff testified that he did laundry but could only do a little bit at a time, and could mop and sweep, but could not vacuum. (Tr. 44-45). He testified that he could not stand to go into a store because he got nervous and sweaty, and that on the occasions he did go with his wife, he became nervous

-4-

and worried if he saw someone he knew.  (Tr. 45).

Plaintiff stated that he could lift and carry five to ten pounds, and could carry one gallon of milk but not two.  (Id.)  He stated that he generally spent his mornings doing a little housework, and that his wife made him lists of things to do.  (Tr. 46).  He stated that, between noon and three o'clock, he ate lunch, watched the news, and did what was left of the laundry, and picked up his daughter from school.  (Id.)  Plaintiff testified that his wife returned from work at 3:30, and that he usually started making dinner, but that his wife finished it, and that after dinner, he and his family watched television.  (Id.)  Plaintiff testified that he could not help his daughter with homework because he could not remember things.  (Tr. 47).  He stated that his "depression kind of started" after his first heart attack and that it affected his ability to think.  (Id.)  He stated that he had to take a lot of breaks from housework during the day because he got hot and then suffered from chest pain.  (Tr. 58).

Plaintiff then testified that he did not watch much television because he could watch something and not remember what happened.[1]  (Tr. 47).  He testified that he did not read (despite being able to), and had no social life, even though he characterized himself as a sociable person.  (Tr. 48).  Plaintiff stated that he got along with his wife and family, and was not involved in any clubs or social organizations.  (Tr. 48-49).  He

---

[1]In his May 1, 2007 Function Report, Plaintiff indicated that his only hobby/interest was watching T.V., and that he did so for two to three hours per day.  (Tr. 186).

stated that he did not go out on the weekends, did not do yard work, and did not go hunting or fishing or play with his daughter like he used to. (Tr. 49-50). He stated that he was unable to take a hot shower. (Tr. 50). He denied using cigarettes, alcohol, and illegal drugs. (Id.)

Plaintiff testified that he took Plavix,[2] Zoloft,[3] Valium,[4] Aspirin, Lisinopril,[5] Nitroglycerin,[6] two cholesterol-lowering medications, and gout medication, and denied suffering side effects. (Tr. 51-54, 58). He stated that Zoloft did not help him but that he took it because his doctor told him to, and stated that Valium helped him to relax, and that he took it when he had to accompany his wife to the store. (Tr. 51-52).

Plaintiff testified that he suffered from chest pains, and took Nitroglycerin daily. (Tr. 54). Plaintiff acknowledged that one of his cardiologists opined that his chest pain was not cardiac in nature and that another cardiologist opined that his

---

[2]Plavix, or Clopidogrel, is used to prevent strokes and heart attacks in people at risk for these problems. It works by helping to prevent harmful blood clots that may cause heart attacks or strokes. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601040.html

[3]Zoloft, or Sertraline, is used to treat depression, anxiety, and other psychological disturbances. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697048.html

[4]Valium, or Diazepam, is used to relieve anxiety, muscle spasms, and seizures, and to control agitation caused by alcohol withdrawal. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682047.html

[5]Lisinopril (also sold under the brand name Zestril) is used to treat hypertension. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a692051.html

[6]Nitroglycerin is used to prevent angina, or chest pain. It works by relaxing the blood vessels to the heart, thereby increasing the flow of blood and oxygen to the heart. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601086.html

chest pain was caused by anxiety and depression. (Tr. 55). The ALJ noted that a psychiatrist observed that plaintiff drank two to three beers per week and that this was interfering with his medication, and plaintiff testified that he stopped drinking on that doctor's advice. (Tr. 56).

Plaintiff testified that he had gout pain in his knee, and pain in his shoulder and back. (Tr. 57-58). He stated that he also suffered from depression and cried daily, and that he suffered from anxiety but did not have anxiety attacks. (Tr. 59). Plaintiff testified that, when he went out, he froze, and also testified that he often lost concentration. (Tr. 59-60). He denied ever having a full-blown panic attack, or being hospitalized for mental problems. (Tr. 59). He has never felt suicidal or attempted suicide, and did not hallucinate or see or hear things. (Tr. 60). Plaintiff testified that he never had trouble getting along with coworkers or supervisors, and could get along with the public.[7] (Tr. 60-61). He stated that he could sit for 10 to 15 minutes before getting nervous and feeling like he had to get away, and stated that he could stand up for a little while, but that it depended on what he was doing. (Tr. 61).

Plaintiff testified that he could walk 50 feet before his knee and back began hurting and he had to sit down. (Tr. 61-62). The ALJ asked Plaintiff if he had trouble bending, stooping,

---

[7]In his May 1, 2007 Function Report, Plaintiff indicated that he had problems getting along with family, friends, neighbors and others, stating that he was easily aggravated and nervous, and did not want to be around people, (Tr. 187), and also indicated that he got along "fair" with authority figures. (Tr. 188).

kneeling, crouching, or crawling, and Plaintiff stated that kneeling hurt his knees and back. (Tr. 62-63). He stated that he had installed a rail to use to help pull himself up the stairs onto the porch. (Id.)

Plaintiff then responded to questioning from his attorney. Plaintiff testified that he could mop and sweep the floor for five or ten minutes, and stated that he had to take breaks due to back and knee pain, and because he got hot and "that's when I get sick to my stomach, then my - - if I don't, my chest starts hurting, so I just go sit down." (Tr. 64). He stated he sometimes took Nitroglycerin, and had to rest for 30 minutes. (Id.) Plaintiff testified that he could carry five to ten pounds of groceries. (Tr. 64-65). Plaintiff's attorney asked him how many trips he could make, and Plaintiff responded that, if he carried a gallon of milk, he could make only one trip. (Tr. 65). He stated that he could stand at the sink and get the dishes started soaking in the water, but then his back started hurting and he had to sit down for a little while, return to washing the dishes, and stop and sit down again. (Id.) Plaintiff testified that he could stand at the sink for five minutes and wash dishes, and that "[s]tanding at the sink is when it really bothers me. yeah, that's - - that's when my - - my knees really really - - my knee and back starts hurting and then when it starts hurting my chest starts hurting, so I have to sit down before - - you know, I don't want my chest to start hurting because it scares me because as many times as I've been to - - had to go to the hospital so."

-8-

(Tr. 65-66).

Plaintiff testified that he had suffered two heart attacks before having open heart surgery, and had had stents implanted three times. (Tr. 66). He stated that he did not go to his daughter's school functions because he could not be around people, explaining that he broke down and started sweating. (Id.) Plaintiff testified that cold weather made his body ache, and hot weather affected him because his chest hurt when he got hot. (Tr. 67).

The ALJ then heard testimony from Susan Shea, a Vocational Expert (also "VE"). After Ms. Shea classified all of Plaintiff's past relevant work, the ALJ asked Ms. Shea to assume an individual 34 years old with a high school education and the past relevant work described, and who was capable of lifting, carrying, pushing, and pulling 20 pounds occasionally and ten pounds frequently, and could sit, stand, and walk each for six of eight in combination for a total of eight out of eight hours, and who was limited to simple repetitive tasks and instructions. (Tr. 71-72). Ms. Shea testified that with such restrictions there would be no transferable work skills, and that such limitations would preclude Plaintiff's past work. (Tr. 72). The ALJ acknowledged that the burden then shifted to the Agency, and asked the VE wither there were other jobs that an individual with such restrictions could perform. (Id.) The VE testified that there was light work as a lawn worker, nursery worker (as in working with plants), and laundry worker. (Id.) The VE testified that this list was

-9-

representative, not exhaustive.  (Id.)

The ALJ then asked the VE to assume an individual of the same age, education, and past relevant work who was able to perform sedentary work as defined in the Social Security Regulations; specifically, that the person could lift, carry, push and pull 20 pounds occasionally and ten pounds frequently; sit for six of eight hours; stand and walk for two out of eight hours for a total of eight out of eight; and who was limited to simple, repetitive tasks and instructions. (Tr. 73). The VE testified that there were not transferable work skills, and that such restrictions precluded Plaintiff's past work, and the ALJ again acknowledged that the burden shifted to the Agency. (Id.) The VE testified that such a person could perform other work such as factory work as a hand assembler, and as a sedentary machine tender or machine worker, table worker, grader, sorter, or inspector, a representative and not exhaustive list. (Tr. 73-74). Under questioning from Plaintiff's counsel, the VE stated that, if Plaintiff's testimony were fully credited, he would be unable to perform the jobs discussed. (Tr. 74-75).

B.  Medical Records[8]

Medical records from Advanced Family Care indicate that Plaintiff was seen on June 20, 2003 with complaints related to depression and low back pain. (Tr. 238). He was noted to appear anxious. (Id.) It was noted that he was working as an auto body

---

[8]The following summary contains medical information dated outside the time period dating between Plaintiff's alleged onset date and the date the ALJ issued his decision.

supplies salesman.   (Id.)   He was assessed with depression and anxiety, and given Prozac[9] and Xanax.[10]   (Id.)   Plaintiff returned on July 18, 2003 and complained of unimproved symptoms of depression, feeling angry and "blue," and feeling work stress despite the fact that he liked his job. (Tr. 239).   Plaintiff was noted to be anxious.   (Id.)   Prozac was discontinued, and Wellbutrin[11] and Darvocet[12] were added.   (Id.)

Plaintiff returned to Advanced Family Care on October 13, 2003 with complaints of knee and back pain. (Tr. 240).   Plaintiff gave a history of having hurt his back seven or eight years ago while working for Horizon, explaining that he had pulled a muscle and had never improved.   (Id.)   Plaintiff also complained of chronic knee pain, and was noted to have swelling and crepitus of the right knee. (Tr. 240).   Darvocet was continued, and Plaintiff was given Soma.[13]   (Id.)   Plaintiff was seen again on October 17, 2003 with the same symptoms. (Tr. 241).

On December 3, 2003, Plaintiff was seen at Advanced Family Care for medication management, and it was noted that

---

[9]Prozac, or Fluoxetine, is used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a689006.html

[10]Xanax, or Alprazolam, is used to treat anxiety disorders and panic attacks.   http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a684001.html

[11]Wellbutrin, or Buproprion, is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695033.html

[12]Darvocet N-100 Propoxyphene is used to relieve mild to moderate pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682325.html

[13]Soma or Carisoprodol, a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682578.html

numerous antidepressant medications had been ineffective.   (Tr.
242).   Plaintiff was started on a trial of Abilify[14] to address his
agitation and mood.   (Id.)   Plaintiff returned on December 12, 2003
and reported that Abilify was doing nothing, a reported a lack of
concentration, continued insomnia, lack of energy, and an increase
in fatigue.   (Tr. 243).   It was noted that his mood was depressed
and his affect was flat.   (Id.)   He was started on a trial of
Ativan[15] to aid sleep.   (Id.)   Plaintiff returned on December 16,
2003 and reported no adverse reactions and an improvement of mood,
concentration, and energy, and a decrease in fatigue.   (Id.)   His
affect was noted to be high, and he was smiling.   (Tr. 243).

Plaintiff returned to Advanced Family Care on February
16, 2004 and March 5, 2004 with complaints of back, knee and left
leg pain.   (Tr. 244-45).   On April 5, 2004, he complained of right
knee pain after twisting it at work.   (Tr. 246).   On April 7, 2004
and April 12, 2004, he complained of intermittent, sharp chest
pain, and was assessed with chest pain and gastroesophageal reflux
disease (also "GERD"), and was given Prilosec.[16]   (Tr. 247-48).   In
addition, Plaintiff stated that Darvocet was not helping him, and

---

[14]Abilify, or Aripiprazole, is used to treat a variety of psychiatric
conditions, and is also used in conjunction with an antidepressant to treat
depression when symptoms cannot be controlled by the antidepressant alone.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603012.html

[15]Ativan, or Lorazepam, is used to treat anxiety.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682053.html

[16]Prilosec, or Omeprazole, is used alone or with other medications to
treat gastroesophageal reflux disease, a condition in which backward flow of
acid from the stomach causes heartburn and possible injury of the esophagus
(the tube between the throat and stomach).
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693050.html

he was given Lortab.[17]  (Tr. 248).  Plaintiff was seen again on May 3, 2004, June 28, 2004, and August 24, 2004 with complaints of chronic back and knee pain.  (Tr. 249-51).  It was noted that he had stopped smoking.  (Tr. 249).  On October 7, 2004, he complained of a stuffy nose, sneezing, and cough.  (Tr. 252).  On October 22, 2004, he complained of pain related to his recent angioplasty, and also complained of anxiety, and it was noted that he may have a panic disorder.  (Tr. 253).  Plaintiff was seen again on October 25, 2004 and December 27, 2004, and reported that Xanax helped him sleep and Darvocet controlled his back and knee pain.  (Tr. 254-55).

Medical records from Cardiovascular Consultants indicates that Plaintiff was seen by David A. Law, M.D., on February 9, 2005,[18] stating that he was off all of his medications because he could not afford them, and took only aspirin.  (Tr. 213). Plaintiff stated that he continued to have chest pain while breathing.  (Id.)  Dr. Law wrote that Plaintiff was doing well from a cardiac standpoint and that his chest pain was noncardiac in nature, but that Plaintiff appeared depressed.  (Id.)  Dr. Law noted that Plaintiff needed to be on cardiac medications, and that he planned to get Plaintiff into an assistance program and give him samples in the meantime.  (Id.)

_____

[17]Lortab is a combination of Acetaminophen and hydrocodone, and is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601006.html

[18]It is indicated that Plaintiff did not show up for an October 13, 2004 appointment, and cancelled a January 17, 2005 appointment.  (Tr. 213).

-13-

On February 21, 2005, Plaintiff was seen at Advanced Family Care with complaints of low back pain after jacking up a car, (Tr. 256) and, when he was seen again three days later, stated that he felt he had re-injured himself while working on the car, and changes in his pain medications were discussed. (Tr. 257). On March 22, 2005, Plaintiff was seen with complaints of back pain and right arm pain after cutting down limbs and throwing them over a fence, and he was diagnosed with muscle strain. (Tr. 258).

On April 4, 2005, Plaintiff returned to Dr. Law, and it was noted that he had recently been seen in the Emergency Room with chest pain, but had a negative workup. (Tr. 214). Dr. Law noted that Plaintiff had "chronic noncardiac chest pain" which was a difficult situation because he actually had coronary disease. (Id.)

Plaintiff was seen at Advanced Family Care on April 19, 2005 with complaints of re-injuring his right knee and back. (Tr. 259). On May 2, 2005, Plaintiff left the office without being seen. (Tr. 260). He returned on May 6, 2005 with complaints of insomnia and sharp stabbing pain, and upon examination was noted to have abdominal tenderness. (Tr. 261). On May 24, 2005, he returned with continued complaints of sharp, stabbing abdominal pain. (Tr. 262). On June 13, 2005, June 20, 2005 and June 27, 2005, he was seen with complaints of right toe pain after injuring it at work. (Tr. 263-65).

On August 4, 2005 and August 16, 2005, Plaintiff was seen at Advanced Family Care in follow-up from his hospital stay, and

-14-

was assessed with atypical chest pain.  (Tr. 266-67).

On September 8, 2005, Plaintiff was seen at Advanced Family Care with complaints of a chest cold, and was diagnosed with acute bronchitis.  (Tr. 268).  There is an office note dated October 3, 2005 indicating that Plaintiff twisted his right knee at work on September 27, 2005.  (Tr. 269).  On October 4, 2005, Plaintiff was seen for a second opinion regarding his right knee injury, and noted that he was told that an MRI had revealed cartilage damage.  (Tr. 270).  Plaintiff also reported that he had been fired from his job.  (Id.)  He complained of insomnia.  (Id.)  He was given Darvon.[19]  (Id.)  He returned for follow-up on October 7, 2005, and reported some improvement but continued pain, and was given an orthopedic referral slip.  (Tr. 271).  His MRI was reviewed, and it was noted that it revealed frayed inner margin of the medial meniscus which was likely degenerative, and a tiny radial tear.  (Id.)  On October 11, 2005, Plaintiff complained of a cough, chest pain, nasal drainage and congestion, and was diagnosed with an upper respiratory infection and given an antibiotic.  (Tr. 272).

On December 9, 2005, Plaintiff was seen at the Gilead Family Practice with complaints ranging from right knee pain to respiratory symptoms.  (Tr. 275-76).  Plaintiff was seen again on January 26, 2006 and reported having had an angiogram and echocardiogram.  (Tr. 276).  Plaintiff stated that he thinks he

---

[19]Darvon, or Propoxyphene, is used to relieve mild to moderate pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682325.html

pulled muscles, and it was also noted that Plaintiff had started taking Crestor[20] on January 25, 2006, and that Lexapro caused nervousness. (Id.) It was noted that Dr. Law was helping get Plaintiff's medications paid for. (Id.) Plaintiff was seen again on January 30, 2006 to discuss antidepressants and was given Wellbutrin, and was seen again on February 3, 2006 to discuss medication and his Darvocet dosage was increased. (Tr. 277-78). On February 7, 2006, March 2, 2006, and March 9, 2006, he was seen with complaints of back pain after hurting it while moving a dryer, and was diagnosed with back pain and thoracic strain, (Tr. 279, 282-83); and on May 22, 2006, he was seen with complaints of back and knee pain. (Tr. 284). On February 23, 2006, he was seen with complaints related to sinusitis. (Tr. 281).

On June 14, 2006, Plaintiff was seen at Gilead Family Practice with complaints of back and left arm pain after a car accident that had occurred that morning, in which Plaintiff had swerved and hit a pole. (Tr. 285). On June 19, 2006, July 31, 2006 and September 5, 2006, Plaintiff was seen with complaints of back pain, and was given medication. (Tr. 286-88).

On September 27, 2006 and October 17, 2006, Plaintiff was seen at the Gilead Family Practice with complaints of right shoulder pain and decreased range of motion. (Tr. 289-90). On October 23, 2006 and November 13, 2006, he continued to complain of

---

[20]Crestor, or Rosuvastatin, is used together with lifestyle changes (diet, weight-loss, exercise) to reduce the amount of cholesterol (a fat-like substance) and other fatty substances in your blood. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603033.html

shoulder pain, and complained of knee and back pain. (Tr. 291). It was noted that he was a nonsmoker. (Tr. 291). On December 6, 2006, he complained of respiratory symptoms. (Tr. 293).

On December 31, 2006, Plaintiff was seen in the Emergency Room of Southeast Missouri Hospital with complaints of non-exertional chest pain over the past two days, and gave a history of having coronary artery disease and myocardial infarction (heart attack) with stent placement in 2004. (Tr. 224). He was taking Plavix and aspirin, and it was noted that he was a smoker but did not drink. (Id.) EKG revealed a normal rhythm, and Plaintiff was given Nitroglycerin and Morphine for pain relief. (Tr. 225). Plaintiff was admitted to the hospital. (Id.) Plaintiff was examined by Billy Hammond, M.D., who assessed acute coronary syndrome with unstable chest pain and possible heart attack, atherosclerotic cardiovascular disease with prior heart attack, and high cholesterol. (Tr. 227). Dr. Hammond noted that Plaintiff would likely require repeat cardiac catheterization. (Id.)

On January 1, 2007, Dr. Hammond performed left heart catheterization, ventriculography, and angiography at Southeast Missouri Hospital. (Tr. 220-21). Also on January 1, 2007, Plaintiff was seen by Randy G. Brown, M.D. (Tr. 222-23). Dr. Brown noted that Plaintiff had a history of coronary artery disease, and that he was a smoker and had been noncompliant with his medication in the past. (Tr. 222). It was noted that Plaintiff had developed recurrent chest pain and was found to have a myocardial infarction. (Id.) Dr. Brown noted that Dr. Hammond

had performed cardiac catheterization which revealed severe coronary artery disease that was not amenable to angioplasty and stent, and coronary artery bypass was recommended. (Id.) The following day, January 2, 2007, Dr. Brown performed double coronary artery bypass surgery at Southeast Missouri Hospital. (Tr. 228-30).

On January 9, 2007, Plaintiff was seen at the Gilead Family Practice and gave a history of his December 31, 2006 admission and surgery. (Tr. 294). He complained of shoulder, neck, back, and lower extremity pain, and was instructed to use Darvocet sparingly, and to be compliant with his medications to avoid future complications. (Id.) Plaintiff returned on January 17, 2007 with complaints of shoulder soreness, and stated that he wanted to stop taking Darvocet because it made him sick and gave him heartburn. (Tr. 295). Plaintiff continued to follow up on a regular basis through March 12, 2007, when he was seen and reported that his father had died in a house fire the preceding night. (Tr. 301). He was advised to take Darvocet and Valium. (Id.)

On May 7, 2007, medical consultant M. Marchi completed a Physical Residual Functional Capacity Assessment. (Tr. 304-08). Therein, consultant Marchi opined that Plaintiff could occasionally lift and/or carry twenty pounds and frequently lift/carry ten; stand and/or walk and sit for six out of eight hours; and push and/or pull without limitation. (Tr. 305). No postural, manipulative, visual, communicative, or environmental limitations were assessed. (Tr. 305-07). Consultant Marchi noted that

-18-

Plaintiff had some medication noncompliance issues due to financial reasons, Plaintiff's allegations were "partially credible," and that the alleged severity of his allegations were not corroborated by the medical and non-medical evidence. (Tr. 308).

On May 9, 2007, Psychologist Marsha Toll completed a Psychiatric Review Technique form in which she opined that Plaintiff had a mood disorder that was not severe and that caused no more than mild functional limitations. (Tr. 309-17). Dr. Toll noted that the record contained a diagnosis of a mood disorder, and that the medical evidence review showed only physical concerns with no psychiatric problems. (Tr. 319). Dr. Toll noted that Plaintiff reported anxiety and depression at all times but was able to drive, help care for his child, and help out around the house, and that the alleged severity was not corroborated by the medical evidence, and Plaintiff's impairment was considered non-severe. (<u>Id.</u>)

On October 25, 2007, Plaintiff was seen by Kenneth W. Retter, M.D., of Cardiovascular Consultants for stress testing, stating that he had been unable to do anything since his bypass surgery. (Tr. 335). Dr. Retter noted that Plaintiff's chest pain was prolonged and atypical when he was hospitalized, and that his enzymes were negative. (<u>Id.</u>) Plaintiff exercised on the treadmill for nine minutes and, although he complained of fatigue and chest pain almost immediately with walking, at the low level of exercise, he increased his speed and finished the study after he was encouraged. (Tr. 335-36). There was no restriction in blood flow during or after the study, and there was no arrhythmia. (<u>Id.</u>)

-19-

On January 3, 2008, Plaintiff was seen by Carol Clark-Kutscher, RN, MSN, in follow-up for coronary artery disease. (Tr. 331). It was noted that Plaintiff had ongoing problems with being very debilitated, and that he had "something going on with his mental status." (Id.) It was noted that he was not sleeping, and had stopped taking Amitriptyline because it caused nightmares. (Id.) Plaintiff reported that he had tried several medications for anger and problems with anger management and depression. (Id.) Plaintiff's Lisinopril dosage was increased, and he was advised to go to the Community Counseling Center or to his physician to get better management of his anxiety, depression and anger. (Tr. 331). It was noted that Plaintiff was stable from a cardiac standpoint, and should return in six to eight months. (Id.)

On March 20, 2008, Plaintiff was seen by K.P.S. Kamath, M.D., a psychiatrist. (Tr. 321-23). Plaintiff reported complaints of severe anxiety and depression of approximately one year's duration, stating that he felt tense and anxious most of the time. (Tr. 321). Plaintiff stated that crowds bothered him, and that going into a shopping center caused him to start sweating and to have chest pain and an increased heart rate. (Id.) Plaintiff reported feeling depressed, hopeless, helpless and tearful all of the time, and reported that he was irritable with his daughter and slept poorly at night. (Id.) Plaintiff reported decreased concentration and interest. (Id.) He reported drinking one or two beers a couple of times per week, which Dr. Kamath noted canceled out the benefits of Cymbalta. (Tr. 321).

-20-

Dr. Kamath noted that Plaintiff had been through serious stresses throughout his life, including 2007 bypass surgery; the death of his father in a fire; and the death of his close friend. (Id.) Dr. Kamath noted that Plaintiff had never dealt with these losses, and that he felt guilt and shame due to his inability to work and to be a good husband and father. (Id.) Dr. Kamath noted that, while growing up, Plaintiff witnessed his parents fight all of the time, and that his mother was in a serious car accident in 1994 and was in a coma for a year. (Tr. 321-22). Upon examination, Dr. Kamath found Plaintiff to be highly anxious and sweating to such an extent that Dr. Kamath had to direct a fan at him. (Tr. 322). Plaintiff was cooperative and oriented to time, place and person, and was not psychotic. (Id.) Dr. Kamath found Plaintiff to be moderately depressed, not suicidal, but hopeless and helpless. (Id.) Dr. Kamath noted that Plaintiff had an episode of chest pain while in the office. (Id.) Dr. Kamath wrote, "[t]his young man has been through more stressful things things [sic] than most people I know. The combination of above stressful factors has created 'low stress tolerance syndrome.' In other words, he has no ability to withstand even a small upsetting situation." (Tr. 322). Dr. Kamath diagnosed Plaintiff with depressive disorder and anxiety disorder, and recommended that Plaintiff continue taking Cymbalta, read a book about stress, start taking Lorazepam, stop drinking completely, and get into counseling. (Tr. 322-23). Dr. Kamath wrote, "[i]n my opinion, this young man is not capable of holding gainful employment due to

-21-

the combination of physical and psychiatric problems in the forseeable [sic] future." (Tr. 323).

On April 8, 2008, Dr. Kamath noted that Lorazepam was causing Plaintiff too much grogginess and was not helping with anxiety. (Tr. 326). It appears that Dr. Kamath recommended Plaintiff switch to Xanax. (Id.) On May 6, 2008, it is noted that Plaintiff was not much better, and that Xanax was making him "higher." (Tr. 327). On July 1, 2008, Plaintiff was doing better and sleeping better. (Id.) On October 29, 2008, Dr. Kamath noted that Plaintiff was doing fairly well. (Id.) These three office notes from Dr. Kamath consist only of a few lines of handwritten text, and do not document Plaintiff's complaints, Dr. Kamath's findings upon examination, or Dr. Kamath's diagnosis. See (Id.)

Records from Cardiovascular Consultants indicate that Plaintiff either rescheduled or canceled appointments scheduled on August 21, 2008, October 6, 2008, and October 27, 2008. (Tr. 328-30).

The following medical information was not part of the original administrative transcript but, as indicated above, was reviewed by the Appeals Council, and was submitted to this Court by Plaintiff's attorney on September 23, 2010. (Docket No. 21). On January 5, 2010, Plaintiff was seen by Dr. Retter for evaluation of prolonged chest pain. (Id. at page 10). Plaintiff stated that he was sitting in a chair at home when he had an onset of chest discomfort that remained constant for several days. (Id.) Dr. Retter wrote that, despite Plaintiff's constant chest discomfort,

-22-

Plaintiff's enzymes were negative.  (<u>Id.</u>)  Plaintiff underwent a stress test using Persantine (as opposed to exercise). (Docket No. 21 at page 9).  On February 21, 2010, however, Dr. Hammond performed left heart catheterization at Southeast Missouri Hospital.  (<u>Id.</u> at pages 6-8).  He indicated that he planned to consult cardiothoracic surgery regarding repeat bypass surgery. (<u>Id.</u> at page 8).

In addition, on the Facsimile Cover Sheet submitted with Docket Number 21, counsel advised that Plaintiff suffered another heart attack on March 2, 2010, and underwent quadruple bypass surgery on that same date.  (Docket No. 21 at page 1).  It was noted that medical records had been ordered.  (<u>Id.</u>)

### III.  The ALJ's Decision

The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2009, and had not engaged in substantial gainful activity since October 1, 2006, the alleged date of onset.  (Tr. 14).  The ALJ determined that Plaintiff had the severe impairments of coronary artery disease, back and knee pain, depression, and anxiety, but did not have an impairment, or combination of impairments, of listing-level severity.  (<u>Id.</u>)  The ALJ determined that Plaintiff was unable to perform any of his past relevant work, (Tr. 19), but retained the residual functional capacity to perform light work as defined in the Commissioner's Regulations, except that Plaintiff was limited to simple, repetitive tasks.  (Tr. 16).

The ALJ opined that Plaintiff's statements about his

symptoms were not credible to the extent they were inconsistent with this RFC.  (Tr. 17).  The ALJ wrote that he was not giving controlling weight to Dr. Kamath's opinion that Plaintiff could not work, inasmuch as Dr. Kamath saw Plaintiff only once and performed a brief examination with no testing, and because the opinion regarding the ability to perform work is one reserved for the Commissioner.  (Tr. 18).  The ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could perform, based upon the VE's testimony, Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy, and concluded that Plaintiff was not disabled as defined in the Act. (Tr. 20-21).

In the case at bar, Plaintiff argues that the ALJ "completely ignored" his testimony about his limitations, and argues that his testimony was corroborated by the medical evidence "included as part of the file in this case and which has been supplemental [sic] by medical records of the continuing cardiac problems of plaintiff."  (Docket No. 16 at page 5).  Plaintiff also suggests that the ALJ improperly considered Dr. Kamath's report, and suggests that the evidence submitted to the Appeals Council supports remand.

### IV.   Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that he is disabled.  Pearsall v.

-24-

<u>Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's impairment(s) is not severe, then he is not disabled.  The Commissioner then determines whether the claimant's impairments meet or equal any of those listed in 20 C.F.R., Subpart P, Appendix

1.  If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

-26-

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of the plaintiff's impairments.

6.   The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

A.    <u>Credibility Determination</u>

Plaintiff argues that the ALJ "completely ignored" his testimony about his limitations, and argues that his testimony was corroborated by the medical evidence "included as part of the file in this case and which has been supplemental [<u>sic</u>] by medical records of the continuing cardiac problems of plaintiff."  Review of the ALJ's decision reveals no error.

Before determining the claimant's residual functional capacity, the ALJ must evaluate the credibility of the claimant's subjective complaints.  <u>Wagner v. Astrue</u>, 499 F.3d 842, 851 (8th Cir. 2007) (citing <u>Pearsall</u>, 274 F.3d at 1217).  Testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of his alleged impairments.  <u>Halpin v. Shalala</u>, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect.  <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1321-22 (8th Cir. 1984).  In <u>Polaski</u>, the Eighth Circuit addressed this difficulty and set forth the following standard:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1)

-28-

the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

Id. at 1322.

Although the ALJ may not accept or reject the claimant's subjective complaints based solely upon personal observations or upon the lack of objective medical evidence, the ALJ may discount them if there are inconsistencies in the evidence as a whole. Id.; see also Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence). The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). The ALJ is not required to discuss each Polaski factor as long as "he acknowledges and considers the factors before discounting a claimant's subjective complaints." Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (citing Goff, 421 F.3d at 791); see also Samons v. Apfel, 497 F.3d 813, 820 (8th Cir. 2007) (citing Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (while the Polaski factors should be taken into account, "we have not required the ALJ's decision to include a discussion of how every Polaski 'factor' relates to the claimant's credibility.") "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." Juszczyk v. Astrue, 542 F.3d 626, 632

-29-

(8th Cir. 2008); see also Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001).  The credibility of a claimant's subjective complaints is primarily for the ALJ to decide, and this Court considers with deference the ALJ's decision on the subject.  Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

In the case at bar, in assessing the credibility of Plaintiff's subjective complaints, the ALJ cited 20 C.F.R. §§ 404.1529 and 416.929, and Social Security Rulings (also "SSR") 96-4p and 96-7p, which correspond with Polaski and credibility determination.  The ALJ discredited Plaintiff's allegations of symptoms precluding all work, noting several factors from the record detracting from his credibility.  Review of the record reveals that the ALJ properly considered all of the evidence of record, and that substantial evidence supports his credibility determination.

The ALJ noted Plaintiff's history of coronary artery disease and two heart attacks, and noted that Plaintiff initially underwent stent placement and subsequently underwent two-vessel coronary artery bypass surgery, and had good results.  Indeed, in 2008, cardiac examination revealed no chest pain with activity, and Plaintiff was considered to be stable from a cardiac standpoint, despite his complaints of being debilitated.  (Tr. 331).  The ALJ noted that, to the extent Plaintiff's conditions were ever uncontrolled, it was because of his non-compliance, for which there was no good excuse.  Consistent with the ALJ's observations, the record indicates that Dr. Brown noted in 2007, the day before

-30-

performing double coronary artery bypass surgery, that Plaintiff was a smoker who had a history of being non-compliant with his medications.  (Tr. 222).

The ALJ also noted that there was no documentation that Plaintiff suffered from medication side effects that were not remedied by adjustments in dosage or medication type, and that there was no evidence that Plaintiff was ever refused medication or services due to an inability to pay.  In fact, the record indicates that Dr. Law was helping ensure that Plaintiff's medications were funded.  (Tr. 276).  While financial hardship may justify a claimant's failure to obtain treatment or take prescription medication, it is not an automatic excuse.  Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992) (citing Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir. 1984)).  In addition, the record indicates that, while Plaintiff reported in 2004 that he had stopped smoking, (Tr. 249), Dr. Brown noted in 2007 (the day before performing double coronary artery bypass surgery) that Plaintiff was a smoker.  (Tr. 222, 228-30).  The fact that a claimant does not forgo smoking to help finance medication detracts from his credibility.  Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999).

The ALJ also noted that Plaintiff had sought some treatment for chronic back and knee pain and had some tenderness at L1-2, but had no knee effusion or crepitus, and there was no radiological or other diagnostic testing evidencing degenerative changes.  While the lack of objective medical evidence is not dispositive, it is an important factor, and the ALJ is entitled to

consider the fact that there is no objective medical evidence to support the degree of alleged limitations. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); <u>Kisling v. Chater</u>, 105 F.3d 1255, 1257-58 (8th Cir. 1997); <u>Cruse</u>, 867 F.2d at 1186 (the lack of objective medical evidence to support the degree of severity of alleged pain is a factor to be considered); <u>Battles v. Sullivan</u>, 902 F.2d 657, 659 (8th Cir. 1990) (ALJ properly denied benefits to claimant who had no medical evidence indicating a serious impairment during the relevant time); <u>Johnson v. Chater</u>, 87 F.3d 1015, 1017-18 (8th Cir. 1996) (it is proper for an ALJ to consider the lack of reliable medical opinions to support a claimant's allegations of a totally disabling condition; in fact, this was noted to be the "strongest support" in the record for the ALJ's determination).

The ALJ noted that, although Plaintiff testified that he alleged disability beginning October 1, 2006 because of a heart attack, there was no specific medical event that took place on that date, but that it was shortly after Plaintiff was fired from a job. The ALJ also noted that, despite Plaintiff's allegations of back and knee pain, he did not have most of the signs typically associated with chronic, severe musculoskeletal pain such as muscle atrophy, persistent or frequently recurring muscle spasms, neurological deficits (motor, sensory or reflex loss) or other signs. This is consistent with the Regulations, which require the ALJ to consider the extent to which a claimant's subjective complaints are consistent with medical signs and laboratory

findings.  20 C.F.R. §§ 404.1529, 416.929(a).  The Eighth Circuit has recognized that an ALJ is bound to accept "alleged functional limitations and restrictions due to pain and other symptoms" only to the extent that they can "reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence." Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir.  2004) (citing 20 C.F.R. §§ 404.1529(a) and 929(a)).

The ALJ also noted that the record fails to reflect that Plaintiff continued to seek ongoing medical treatment for his back or knees.  The ALJ noted that Plaintiff had not had surgery or been hospitalized since January of 2007, and had not been referred for physical therapy, to a pain clinic or a pain disorders specialist for treatment.  The undersigned notes that the Gilead Family Practice prescribed Wellbutrin on January 30, 2006, but the treatment note does not indicate what Plaintiff's complaints were or whether he requested or was referred to see a psychiatrist.  The absence of consistent, ongoing medical treatment is inconsistent with subjective complaints of debilitating symptoms.  See Onstead v. Sullivan, 962 F.2d 803, 805 (8th Cir. 1992); see also Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (claimant's failure to seek medical assistance for her alleged physical and mental impairments contradicted her subjective complaints of disabling conditions).

The ALJ noted that the medical evidence established no inability to ambulate effectively or perform fine and gross movements effectively on a sustained basis due to any

-33-

musculoskeletal impairment.  The ALJ noted that Plaintiff walked in and out of the hearing room without the use of an assistive device; sat normally through the hour long hearing; and demonstrated no difficulty moving his neck, shoulders, arms, hands and fingers. "The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations." Johnson, 240 F.3d at 1147-48 (citing Smith v. Shalala, 987 F.2d 1371, 1375 (8th Cir. 1993)).

The ALJ noted that Plaintiff's daily activities were restricted by his choice rather than any medical proscription, and that there was no documented evidence of non-exertional pain or anything that would seriously interfere with or diminish his ability to concentrate.  The ALJ noted that Plaintiff's abilities to think, understand, communicate, concentrate, get along with others, and handle normal work stress had never been significantly impaired on any documented long-term basis.  The ALJ noted that there was never any documented serious deterioration in Plaintiff's personal hygiene or habits, and that, during the hearing, Plaintiff displayed no obvious signs of depression, anxiety, memory loss or other mental disturbance.  The ALJ also noted that none of Plaintiff's treating doctors (with the exception of Dr. Kamath's statement that Plaintiff was not capable of holding employment) placed any specific long-term limitations on his ability to stand, sit, walk, bend, lift, carry, or do other basic work activities. This finding was proper.  A record, such as that in the case at bar, that does not reflect credible physician-imposed restrictions

-34-

during the relevant time frame suggests that the claimant's restrictions in daily activities are self-imposed rather than restricted by medical necessity. See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (adverse credibility determination supported by finding that no physician had imposed any work-related restrictions); see also Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004) ("[T]here is no medical evidence supporting [the claimant's] claim that she needs to lie down during the day"); Fredrickson v. Barnhart, 359 F.3d 972, 977 n. 2 (8th Cir. 2004) ("There is no evidence in the record that [the claimant] complained of severe pain to his physicians or that they prescribed that he elevate his foot or lie down daily.")  The undersigned therefore concludes that the ALJ properly considered Plaintiff's daily activities upon choosing to discredit his complaints of debilitating pain.

Plaintiff suggests that the ALJ failed to properly consider Dr. Kamath's opinion.  The undersigned disagrees.  The Commissioner's Regulations provide that an ALJ will give a treating physician's opinion "on the issue[s] of the nature and severity of [an] impairment[ ]" controlling weight if such opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2).  In the case at bar, while Dr. Kamath was obviously sympathetic to Plaintiff and considered that Plaintiff had been subjected to great adversity, Dr. Kamath did not

indicate that his opinion was based upon any medically acceptable
diagnostic techniques.  In addition, as the ALJ noted, at the time
Dr. Kamath issued his opinion that Plaintiff was incapable of
gainful employment, he had seen Plaintiff on only one occasion, and
subsequently noted that Plaintiff was "doing better" and was doing
"fairly well."  (Tr. 327).  Greater weight will be given to the
opinion of a treating source who has seen the claimant "a number of
times and long enough to obtain a longitudinal picture" of the
claimant's impairment.  20 C.F.R. §§ 1527(d)(2)(i) and
416.927(d)(2)(i).  This rule is premised, at least in part, on the
concept that a physician with a longstanding treatment relationship
with the claimant is more familiar with a claimant's condition than
are other physicians.  Thomas v. Sullivan, 928 F.2d 255, 259 n. 3
(8th Cir. 1991).  It cannot be said that the ALJ in this case erred
in refusing to give  great weight to an opinion expressed after
just one visit.  See Randolph, 386 F.3d at 840 (the opinion of a
physician who has seen a claimant on only one occasion is not
entitled to significant weight.)  Finally, as the Commissioner
notes, the opinion that Plaintiff was "not capable of holding
gainful employment" is not a medical opinion regarding what
Plaintiff's actual limitations and abilities are; it is the
doctor's opinion regarding whether Plaintiff can work.  This
decision is reserved for the Commissioner.  House v. Astrue, 500
F.3d 741, 745 (8th Cir. 2007) (citing Krogmeier v. Barnhart, 294
F.3d 1019, 1023 (8th Cir. 2002) ("A treating physician's opinion
that a claimant is disabled or cannot be gainfully employed gets no

-36-

deference because it invades the province of the Commissioner to make the ultimate disability determination.”))

Finally, as indicated above, the record indicates that, while Plaintiff reported that he had stopped smoking in 2004, he apparently resumed, inasmuch as Dr. Brown noted in 2007 that Plaintiff was a smoker who was not compliant with his medications. The fact that Plaintiff smoked cigarettes despite his diagnosis of coronary artery disease detracts from his credibility.   See Kisling, 105 F.3d at 1257 (An ALJ may properly consider a claimant’s failure to quit smoking as a factor detracting from credibility).

A review of the ALJ’s credibility determination shows that, in a manner consistent with and required by Polaski, he considered Plaintiff’s subjective complaints on the basis of the entire record before him, and set forth numerous inconsistencies detracting from Plaintiff’s credibility.  An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole.  Battles, 902 F.2d at 660.  The ALJ in this case did not, as Plaintiff suggests, completely ignore his testimony, or improperly evaluate his allegations.  Because the ALJ considered the Polaski factors and discredited Plaintiff’s subjective complaints for a good reason, that decision should be upheld. Hogan, 239 F.3d at 962.

B.   New Evidence

Plaintiff next suggests that the Commissioner erred in failing to consider new and material evidence that he presented to

-37-

the Appeals Council and that supports remand. As indicated above, this evidence consists of records from Southeast Missouri Hospital dating from January 5, 2010 to March 2, 2010. This evidence was not part of the original administrative transcript, but was submitted to this Court by Plaintiff. The evidence documents Plaintiff's visit to Southeast Missouri Hospital on January 5, 2010 with complaints of chest pain, and a subsequent cardiac catheterization. (Docket No. 21). Having reviewed the entire record, including the new evidence submitted to the Appeals Council and counsel's statement, the undersigned finds no basis for reversal.

The Appeals Council must consider additional evidence when it is new, material, and related to the period on or before the ALJ's decision. See 20 C.F.R. § 404.970(b); Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000). Evidence is material when it relates to the claimant's condition for the time period for which benefits were denied, and not to "after-acquired conditions or post-decision deterioration of a pre-existing condition." Bergmann, 207 F.3d at 1069-70. The timing of the examination is not dispositive; rather, medical evidence obtained after an ALJ's decision is material if it relates to the claimant's condition on or before the date of the ALJ's decision. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984).

Once the Appeals Council considers new evidence, this court does not evaluate the Appeals Council's decision to deny review, but rather determines whether the record as a whole,

-38-

including the new evidence, supports the ALJ's decision.  <u>Davidson</u>
<u>v. Astrue</u>, 501 F.3d 987, 990 (8th Cir. 2007); <u>Cunningham v. Apfel</u>,
222 F.3d 496, 500 (8th Cir. 2000).  In order to support a remand,
new evidence must be "relevant, and probative of the claimant's
condition for the time period for which benefits were denied."
<u>Estes</u>, 275 F.3d at 725 (quoting <u>Jones v. Callahan</u>, 122 F.3d 1148,
1154 (8th Cir. 1997)).

     In the case at bar, the evidence submitted to and
considered by the Appeals Council does not support remand because
it is immaterial to Plaintiff's condition for the time period for
which benefits were denied.  The ALJ in this case issued his
decision on March 23, 2009, and the newly submitted evidence is
dated nearly one year later and contains no indication that it is
probative of Plaintiff's condition on or before March 23, 2009.
The medical evidence in the administrative transcript pertaining to
the relevant time period shows that Plaintiff had cardiac symptoms
and was diagnosed with coronary artery disease, received cardiac
treatment, and was determined to be stable from a cardiac
standpoint.  (Tr. 331).  Medical evidence documenting that he
suffered chest pain and required cardiac catheterization
approximately one year later is not probative of his condition
during the relevant time period.  Evidence is material when it
relates to the claimant's condition for the time period for which
benefits were denied, and not to "after-acquired conditions or
post-decision deterioration of a preexisting condition." <u>Bergmann</u>,
207 F.3d at 1069-70.  If Plaintiff's cardiac condition has indeed

deteriorated, his remedy is to file a new application.  In order to support remand, evidence must be probative of Plaintiff's condition for the time period for which benefits were denied.  See Estes, 275 F.3d at 725 (quoting Jones, 122 F.3d at 1154).

Plaintiff alleges no other points of error.  Therefore, for all of the foregoing reasons, on the claims that Plaintiff raises,

**IT IS HEREBY ORDERED** that the Commissioner's decision be affirmed, and Plaintiff's Complaint be dismissed with prejudice.


_____
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 2nd day of September, 2011.